

1  GREGG SHAPIRO, Cal. Bar No. 161436
   gshapiro@greggshapirolaw.com
2  GREGG SHAPIRO LAW
   101 Federal Street, Suite 1900
3  Boston, MA 02110
   Telephone: 617-582-3875
4
   Attorney for Relator
5  INTEGRA MED ANALYTICS LLC

6

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10             LA23CV06930-MWF(AJRx)

11 UNITED STATES and STATE OF          Case No.
   CALIFORNIA *ex rel*. INTEGRA MED
12 ANALYTICS LLC,                      **FALSE CLAIMS ACT
                                       COMPLAINT (FILED UNDER
13          Plaintiffs,                SEAL PURSUANT TO 31 U.S.C.
                                       § 3730(B)(2))**
14        v.

15 RENEW HEALTH CONSULTING
   SERVICES, LLC, RENEW HEALTH
16 GROUP, LLC, PACIFIC
   HEALTHCARE GROUP, LLC,
17 HEALTH CARE PARTNERS I, LLC,
   CRYSTAL SOLORZANO,
18 ARROWHEAD HEALTHCARE
   CENTER, LLC, GRIFFITH PARK
19 REHABILITATION CENTER, LLC,
   THE REHABILITATION CENTER
20 OF ORANGE COUNTY, LLC, HYDE
   PARK REHABILITATION CENTER,
21 LLC, LAKE MERRITT
   HEALTHCARE CENTER, LLC,
22 ORINDA CARE CENTER, LLC,
   PARKWEST REHABILITATION
23 CENTER, LLC, REDWOOD
   HEALTHCARE CENTER, LLC,
24 RIVERSIDE HEIGHTS
   HEALTHCARE CENTER, LLC,
25 SANTA FE HEIGHTS HEALTHCARE
   CENTER, LLC, VALLEY VISTA
26 NURSING AND TRANSITIONAL
   CARE, LLC, INLAND VALLEY
27 PARTNERS, LLC, MIRACLE MILE
   HEALTHCARE CENTER, LLC,
28 PREMIER CARE – SIMI VALLEY,

                         -1-

LLC, SILVERSCREEN HEALTHCARE, INC., MESA GLEN HOLDINGS, LLC, SANTA ANITA CONVALESCENT HOSPITAL & RETIREMENT CENTER, INC., SELA HEALTHCARE, INC., 1100 SOUTH ALVARADO STREET, LLC, P AND M HEALTH CARE HOLDINGS, INC., SAN FERNANDO SUBACUTE REHABILITATION CENTER, LLC, 3GENCARE, INC., and CENTRAL CONVALESCENT HOSPITAL OF GLENDALE, INC.,

Defendants.

## Introduction

1.    Integra Med Analytics LLC ("Relator") brings this action as a *qui tam* relator on behalf of the United States and the State of California against Defendants – individuals and entities associated with the 24 below-listed California skilled nursing facilities (the "ReNew Health SNFs") that have been managed by ReNew Health Consulting Services, LLC ("ReNew Health Consulting") – pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729-33, and the California False Claims Act, Cal. Gov. Code § 12650, *et seq.*, to recover damages, penalties, attorney fees and costs, and other relief.

2.    Relator alleges that Defendants submitted, or caused the submission of, false and inflated claims to Medicare and Medi-Cal from at least as early as 2016 through at least 2021. Relator's multifaceted investigation, which consisted of its own unique statistical analyses of non-public claims data obtained from the Centers for Medicare and Medicaid Services ("CMS") and numerous interviews of Defendants' former employees, shows that the ReNew Health SNFs (1) billed for excessive and unnecessary rehabilitation services under the Resource Utilization Groups, version IV ("RUG-IV") SNF reimbursement system (which ceased effect at the end of September 2019), (2) submitted false claims with excessive diagnoses and patient assessment scores under the Patient Driven Payment Model ("PDPM")

SNF reimbursement system (which took effect in October 2019), and (3) kept patients longer than necessary, all to maximize reimbursement without regard for patients' individual medical needs.

3.      Relator's analysis reveals significant increases in reporting of Ultra High ("RU") therapy levels under RUG-IV at certain ReNew Health SNFs immediately after their acquisition by defendant Crystal Solorzano. Relator's statistical testing further demonstrates that the change at each of these SNFs could not have occurred by chance.

4.      After the switch to the PDPM billing model in October 2019, Relator's analysis shows, Defendants inflated the Medicare claims at all of the ReNew Health SNFs by fraudulently manipulating the Nursing and Speech-Language Pathology components of the PDPM case-mix classification system. With respect to the Nursing component of PDPM, Defendants excessively coded patients for i) depression, and ii) requiring Special Care High. With respect to the Speech Language Pathology component of PDPM, Defendants excessively coded patients with diet disorders, acute neurologic conditions, speech-language pathology comorbidities, and cognitive impairment. Relator's analysis further shows that, after the implementation of PDPM, coding of such conditions increased dramatically at ReNew Health SNFs – and continued to increase through 2021 – but generally did not increase materially at other SNFs nationwide. This indicates that the ReNew Health SNFs changed their coding practices under PDPM solely to maximize revenue.

5.      Relator's statistical analyses further demonstrates that the ReNew Health SNFs kept Medicare Part A residents for excessive lengths of stay, often for 100 days, the maximum number of days billable under Medicare Part A, regardless of underlying patient conditions.

6.      The statements of former ReNew Health SNF employees indicate and confirm that, under PDPM, management from ReNew Health Consulting: (i)

1  directed ReNew Health SNF staff to change initial assessments of patients' health in
2  order to target key payment thresholds and increase reimbursement for the PDPM
3  Nursing and Speech-Language Pathology components, and (ii) engaged in
4  systematic efforts to keep patients longer than necessary by disregarding staff-
5  recommended discharge dates.

6       7.     Finally, Relator alleges that the ReNew Health SNFs submitted false
7  claims to Medi-Cal. When patients at the ReNew Health SNFs were dually-eligible
8  for Medicare and Medicaid and had stays beyond 20 days, the patients incurred
9  daily Medicare copayments that Medi-Cal covered. Thus, when Defendants kept the
10 patients in SNF care for longer than necessary, Defendants fraudulently caused
11 Medi-Cal to pay the daily Medicare copayments for those patients.

12      8.     Relator is an original source of the Complaint allegations.

13      9.     Prior to the filing of this Complaint, Relator made substantive
14 disclosures to the government of facts and evidence underlying the allegations in
15 this Complaint, in accordance with the requirements of the False Claims Act, 31
16 U.S.C. § 3730(b)(2).

17      10.    This action is filed in camera and under seal pursuant to the
18 requirements of the False Claims Act, 31 U.S.C. § 3730(b)(2), and the California
19 False Claims Act, Cal. Gov. Code § 12652(c)(2).

20                       **Jurisdiction and Venue**

21      11.    This Court has jurisdiction over this action pursuant to 28 U.S.C.
22 §§ 1331 and 1345 and 31 U.S.C. § 3732, which confers jurisdiction over actions
23 brought pursuant to 31 U.S.C. §§ 3729 and 3730.

24      12.    This Court has original and supplemental jurisdiction over the state law
25 claim pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367 because this action is
26 brought under California law for the recovery of funds paid by the State of
27 California, and because it arises from the same transactions or occurrences as the
28 claims Relator brings on behalf of the United States under 31 U.S.C. § 3730.

13.    This Court may exercise personal jurisdiction over each of the Defendants, and venue is appropriate in this Court, under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b), because most of the Defendants can be found in this District and because a substantial part of the events or omissions giving rise to this action occurred in this District.

## The Parties

14.    Relator Integra Med Analytics LLC is a Texas limited liability company with its principal place of business in Austin, Texas.

15.    Defendant ReNew Health Consulting Services, LLC, is a California limited liability company with a principal office at 107 W. Lemon Avenue, Monrovia, CA 91016. ReNew Health Consulting manages, or until recently has managed, the 24 ReNew Health SNFs identified in paragraphs 20 through 42 below. These SNFs have at least four different ownership arrangements, as further set forth below.

16.    Defendant ReNew Health Group, LLC ("ReNew Health Group"), is a California limited liability company with a principal office at 107 W. Lemon Avenue, Monrovia, CA 91016. As further described below, ReNew Health Group owns certain SNFs.

17.    Defendant Pacific Healthcare Group, LLC ("Pacific Healthcare"), is a California limited liability company with a principal office at 107 W. Lemon Avenue, Monrovia, CA 91016. As further described below, Pacific Healthcare owns certain SNFs.

18.    Defendant Health Care Partners I, LLC ("HC Partners I"), is a California limited liability company with a principal office at 107 W. Lemon Avenue, Monrovia, CA 91016. As further described below, HC Partners I owns certain SNFs.

19.    Defendant Crystal Solorzano is a resident of the State of California. According to California Department of Public Health ("DPH") records, Solorzano

1 has owned 99 percent of ReNew Health Group since 2014, 99 percent of Pacific

2 Healthcare since April 2016, and 99 percent of HC Partners I since March 2017.

3 Solorzano also owns ReNew Health Consulting. According to CMS and California

4 DPH ownership data, she is, or until recently was, an owner, officer, or manager of

5 the 11 ReNew Health SNFs identified in paragraphs 20 through 30 below.

6       **A.    ReNew Health SNFs Owned by Solorzano**

7       20.    Defendant Arrowhead Healthcare Center, LLC ("Arrowhead"), is a

8 California limited liability company that provides skilled nursing services at 4343 N.

9 Sierra Way, San Bernardino, CA 92407. According to California DPH data,

10 Solorzano has owned Arrowhead through ReNew Health Group since December

11 2014. According to CMS data, Solorzano has been Arrowhead's only officer since

12 April 1, 2015. Arrowhead's National Provider Identifier ("NPI") is 1659768406.

13      21.    Defendant Griffith Park Rehabilitation Center, LLC, d/b/a Griffith Park

14 Healthcare Center ("Griffith Park"), is a California limited liability company that

15 provides skilled nursing services at 201 Allen Avenue, Glendale, CA 91201.

16 According to California DPH data, Solorzano has been the majority owner of

17 Griffith Park through ReNew Health Group since December 2015. According to

18 CMS ownership data, Solorzano has been Griffith Park's only officer and an owner

19 of Griffith Park since June 30, 2015. Griffith Park's NPI is 1922482678.

20      22.    Defendant The Rehabilitation Center of Orange County, LLC, d/b/a

21 Healthcare Center of Orange County ("Orange County"), is a California limited

22 liability company that provides skilled nursing services at 9021 Knott Avenue,

23 Buena Park, CA 90620. According to California DPH data, Solorzano has owned

24 Orange County through ReNew Health Group since May 2017. According to CMS

25 ownership data, Solorzano has been Orange County's only officer and owner since

26 November 11, 2016. Orange County's NPI is 1619424553.

27      23.    Defendant Hyde Park Rehabilitation Center, LLC, d/b/a Hyde Park

28 Healthcare Center ("Hyde Park"), is a California limited liability company that

-6-

provides skilled nursing services at 6520 West Boulevard, Los Angeles, CA 90043. According to California DPH data, Solorzano has owned Hyde Park through Pacific Healthcare since February 2018. According to CMS ownership data, Solorzano has been Hyde Park's only officer and owner since September 1, 2016. Hyde Park's NPI is 1275088916.

24.    Defendant Lake Merritt Healthcare Center, LLC ("Lake Merritt"), is a California limited liability company that provides skilled nursing services at 309 MacArthur Boulevard, Oakland, CA 94610. According to California DPH data, Solorzano has owned Lake Merritt through HC Partners I since March 2017. According to CMS ownership data, Solorzano has been Lake Merritt's only officer and owner since November 1, 2016. Lake Merritt's NPI is 1801345772.

25.    Defendant Orinda Care Center, LLC ("Orinda Care Center"), is a California limited liability company that provides skilled nursing services at 11 Altarinda Road, Orinda, CA 94563. According to California DPH data, Solorzano has owned Orinda Care Center since September 2016. According to CMS ownership data, Solorzano has been Orinda Care Center's only officer and owner since April 11, 2015. Orinda Care Center's NPI is 1154718773.

26.    Defendant Parkwest Rehabilitation Center, LLC, d/b/a Parkwest Healthcare Center ("Parkwest"), is a California limited liability company that provides skilled nursing services at 6740 Wilbur Avenue, Reseda, CA 91335. According to CMS ownership data, Solorzano has been Parkwest's only officer and owner since August 18, 2015. Parkwest's NPI is 1316313281. California DPH data indicates that Parkwest came under new ownership in June 2022, but CMS ownership data from July 2023 still lists Solorzano and Parkwest Rehabilitation Center, LLC, as owners of the facility.

27.    Defendant Redwood Healthcare Center, LLC ("Redwood"), is a California limited liability company that provides skilled nursing services at 3145 High Street, Oakland, CA 94619. According to California DPH data, Solorzano has

-7-

1  owned Redwood through HC Partners I since March 2017. According to CMS

2  ownership data, Solorzano has been Redwood's only officer and an owner of

3  Redwood since November 1, 2016. Redwood's NPI is 1184173056.

4      28.    Defendant Riverside Heights Healthcare Center, LLC ("Riverside

5  Heights"), is a California limited liability company that provides skilled nursing

6  services at 8951 Granite Hill Drive, Riverside, CA 92509. According to California

7  DPH data, Solorzano has been the majority owner of Riverside Heights through

8  ReNew Health Group since July 2015. According to CMS ownership data,

9  Solorzano has been Riverside Heights' only officer and owner since April 1, 2015.

10  Riverside Heights' NPI is 1083006712.

11      29.    Defendant Santa Fe Heights Healthcare Center, LLC ("Santa Fe

12  Heights"), is a California limited liability company that provides skilled nursing

13  services at 2309 N. Santa Fe Avenue, Compton, CA 90222. According to California

14  DPH data, Solorzano has owned Santa Fe Heights through Pacific Healthcare since

15  April 2016. According to CMS ownership data, Solorzano has been Santa Fe

16  Heights' only officer and owner since December 15, 2015. Santa Fe Heights' NPI is

17  1356716815.

18      30.    Defendant Valley Vista Nursing and Transitional Care, LLC ("Valley

19  Vista"), is a California limited liability company that provides skilled nursing

20  services at 6120 N. Vineland Avenue, North Hollywood, CA 91606. According to

21  California DPH data, Solorzano has owned Valley Vista through HC Partners I

22  since March 2018. According to CMS ownership data, Solorzano has been Valley

23  Vista's only officer and owner since December 1, 2016. Valley Vista's NPI is

24  1750833497.

25  **B.    ReNew Health SNFs Owned by Phillip Chase**

26      31.    Defendant Inland Valley Partners, LLC, d/b/a Inland Valley Care and

27  Rehabilitation Center ("Inland Valley," NPI 1841232279), is a California limited

28  liability company that provides skilled nursing services at 250 W. Artesia Street,

Pomona, CA 91768. According to CMS ownership data, Phillip Chase ("Chase") has owned Inland Valley since October 1, 2003. According to California DPH data, Chase has owned 25 percent of Inland Valley since 2003.

32.    Defendant Miracle Mile Healthcare Center, LLC ("Miracle Mile," NPI 1437789252), is a California limited liability company that provides skilled nursing services at 1020 South Fairfax Avenue, Los Angeles, CA 90019. According to CMS ownership data, Chase has owned Miracle Mile since February 1, 2020. According to California DPH data, Chase has owned 100 percent of Miracle Mile since August 2020.

33.    Defendant Premier Care - Simi Valley, LLC, d/b/a Simi Valley Care Center ("Simi Valley," NPI 1760424394), is a California limited liability company that provides skilled nursing services at 5270 E. Los Angeles Avenue, Simi Valley, CA 93063. According to CMS ownership data, Chase has owned Simi Valley since November 18, 1996. According to California DPH data, Simi Valley came under new ownership in June 2023.

**C.    ReNew Health SNFs Owned by Philip Weinberger, Marylynn Mahan, Martin Weiss, and Hadassah Weiss**

34.    Defendant Silverscreen Healthcare, Inc., d/b/a Asistencia Villa Rehabilitation and Care Center ("Asistencia"), is a California corporation that provides skilled nursing services at 1875 Barton Road, Redlands, CA 92373. According to California DPH data, Philip Weinberger, Marylynn Mahan, Martin Weiss, and Hadassah Weiss have been owners of Asistencia since 2010. According to a letter to Solorzano from the California DPH, she has operated Asistencia under a "Management Operations and Transfer Agreement" since at least August 5, 2019. Asistencia's NPI is 1720307796.

35.    Defendant Mesa Glen Holdings, LLC, d/b/a Mesa Glen Care Center ("Mesa Glen"), is a California limited liability company that provides skilled nursing services at 638 E. Colorado Avenue, Glendora, CA 91740. According to

California DPH data, Philip Weinberger, Marylynn Mahan, Martin Weiss, and Hadassah Weiss have been owners of Mesa Glen since 2008. According to a letter to Solorzano from the California DPH, she has operated Mesa Glen under a "Management Operations and Transfer Agreement" since at least August 5, 2019. Mesa Glen's NPI is 1932215100.

36.    Defendant Santa Anita Convalescent Hospital & Retirement Center, Inc., d/b/a Santa Anita Convalescent Hospital ("Santa Anita"), is a California corporation that provides skilled nursing services at 5522 Gracewood Avenue, Temple City, CA 91780. According to CMS ownership data, Martin Weiss has owned Santa Anita since 2013. Santa Anita's NPI is 1134175201.

37.    Defendant Sela Healthcare, Inc., d/b/a Villa Mesa Care Center ("Villa Mesa") and Holiday Manor Care Center ("Holiday Manor"), is a California corporation with a principal address of 16742 Orange Way, Fontana, CA 92335. Villa Mesa is a SNF at 867 E. 11th Street, Upland, CA 91786. According to California DPH data, Philip Weinberger, Marylynn Mahan, Martin Weiss, and Hadassah Weiss have owned Villa Mesa through Sela Healthcare, Inc., since 2004. On information and belief, Solorzano is seeking state approval to purchase Villa Mesa. Villa Mesa's NPI is 1588770929. Holiday Manor is a SNF at 20554 Roscoe Blvd, Canoga Park, CA 91306. According to California DPH data and CMS ownership data, Philip Weinberger, Marylynn Mahan, Martin Weiss, and Hadassah Weiss have owned Holiday Manor through Sela Healthcare, Inc., since 2004. Holiday Manor's NPI is 1710082193.

38.    Defendant 1100 South Alvarado Street, LLC, d/b/a Olympia Convalescent Hospital ("Olympia"), is a California limited liability company that provides skilled nursing services at 1100 S. Alvarado St., Los Angeles, CA 90006. According to CMS ownership data, Hadassah Weiss has owned Olympia since May 27, 2012, with Martin Weiss listed as an officer since May 27, 2012. According to

California DPH data, Hadassah Weiss has owned 25.75 percent of Olympia since 2012. Olympia's NPI is 1114291523.

39.    Defendant P and M Health Care Holdings, Inc., d/b/a Rancho Mesa Care Center ("Rancho Mesa"), is a California corporation that provides skilled nursing services at 9333 La Mesa Drive, Alta Loma, CA 91701. According to California DPH data, Philip Weinberger and Marylynn Mahan have owned Rancho Mesa through P and M Health Care Holdings, Inc., since 2002. Rancho Mesa's NPI is 1366558827.

40.    Defendant San Fernando Subacute Rehabilitation Center, LLC, d/b/a Golden Legacy Care Center ("Golden Legacy"), is a California limited liability company that provides skilled nursing services at 12260 Foothill Boulevard, Sylmar, CA 91342. According to CMS ownership data, Martin Weiss has owned Golden Legacy since June 1, 2019, and Philip Weinberger and Marylynn Mahan previously owned Golden Legacy d/b/a San Fernando Post Acute Hospital from 2008 to 2019. According to California DPH data, Golden State Health Centers, Inc., owns 94.33% of Golden Legacy, Martin Weiss owns 20.66% of Golden State Health Centers, Inc., and Howard Weiss owns 23% of Golden State Health Centers, Inc. Golden Legacy's NPI is 1235781436.

**D.    Other SNFs That Solorzano Is Seeking to Acquire**

41.    Defendant 3gencare, Inc., d/b/a San Marino Manor ("San Marino Manor"), is a California corporation that provides skilled nursing services at 6812 N. Oak Avenue, San Gabriel CA 91775. According to a letter to Solorzano from the California DPH, she has operated San Marino Manor under a "Management Operations and Transfer Agreement" since at least January 9, 2020.  San Marino Manor's NPI is 1750670469.

42.    Defendant Central Convalescent Hospital of Glendale, Inc., d/b/a Chandler Convalescent Hospital ("Chandler Convalescent"), is a California corporation that provides skilled nursing services at 525 South Central Avenue,

1  Glendale, CA 91204. CMS ownership data lists Henry Le Vine as the sole owner of

2  Chandler Convalescent, but, on information and belief, Solorzano is seeking to

3  acquire it. Chandler Convalescent's NPI is 1164575320.

4                               **Legal Background**

5  **A.    General Requirements for SNF Billing**

6       43.    Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*,

7  establishes the Health Insurance for the Aged and Disabled Program, commonly

8  referred to as the Medicare Program ("Medicare").

9       44.    The Medicare program is divided into "parts." Medicare Part A

10 generally covers inpatient hospital services, home health and hospice care, and

11 skilled nursing and rehabilitation care. Medicare Part B covers physician, outpatient,

12 durable medical equipment, and ancillary services. Qualifying individuals can enroll

13 in Medicare through Medicare Parts A and B (Original Medicare) or through

14 Medicare Advantage, which is Medicare Part C. Original Medicare is administered

15 by the federal government, whereas Medicare Advantage plans are administered by

16 private insurers such as UnitedHealth Group and Elevance.

17      45.    Under Medicare Part A, CMS reimburses skilled nursing facilities on a

18 fee-for-service basis. In order to bill Medicare Part A, a SNF submits a CMS-1450

19 (also known as a UB-04) claim form to Medicare through a Medicare

20 Administrative Contractor, which pays the corresponding Medicare reimbursement

21 amount. On the form, the SNF must state, among other things, the procedure(s) for

22 which it is billing Medicare, the identity of the patient, the provider number, and a

23 brief narrative explaining the diagnosis. *See Medicare Claims Processing Manual*,

24 Ch. 25, § 75 (Aug. 6, 2021).

25      46.    To be eligible for reimbursement under Medicare Part A, SNF services

26 must be for a patient enrolled in Medicare who had a qualifying inpatient hospital

27 stay and who requires daily skilled services for an ongoing condition treated during

28 the hospital stay or a new condition that the beneficiary acquired while receiving

post-hospital SNF care. *See* 42 C.F.R. § 409.20 *et seq.*; CMS Product No. 10153, *Medicare Coverage of Skilled Nursing Facility Care*, Section 2 ("Will Medicare cover skilled nursing facility (SNF) care?") (July 15, 2019), *available at* https://www.medicare.gov/Pubs/pdf/10153-Medicare-Skilled-Nursing-Facility-Care.pdf.

47.    Specifically, a beneficiary must have had a preceding inpatient hospitalization of at least three consecutive days. *See* 42 U.S.C. § 1395x(i).[1] Following a qualifying hospital stay, Medicare will cover up to 100 days of SNF care per spell of illness. *See* 42 U.S.C. § 1395d(a)(2)(A). For the first 20 days, Medicare pays for all covered services. *See* 42 C.F.R. § 409.61(b), (c). Beginning on the 21st day of skilled nursing care, the beneficiary is responsible for a daily copayment, which is currently $200. *Id.*; 42 C.F.R. § 409.85(b); CMS, *Skilled nursing facility (SNF) care*, *available at* https://www.medicare.gov/coverage/skilled-nursing-facility-snf-care.

48.    If a patient is dually eligible for Medicare and Medi-Cal, then Medi-Cal often will cover the Part A copayment for SNF care. *See* CMS, Medicare Learning Network Fact Sheet MLN006977, *Beneficiaries Dually Eligible for Medicare & Medicaid*, *available at* https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/Medicare_Beneficiaries_Dual_Eligibles_At_a_Glance.pdf.

49.    Medicare Part A covers only those services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A). In the context of skilled rehabilitation therapy, this means that the

---

[1] The three-day prior hospital stay requirement was temporarily waived during the COVID emergency. *See* CMS, *COVID-19 Emergency Declaration Blanket Waivers for Health Care Providers*, *available at* https://www.cms.gov/files/document/covid-19-emergency-declaration-waivers.pdf.

1  services furnished must be consistent with the nature and severity of the patient's

2  individual illness, injury, or particular medical needs; must be consistent with

3  accepted standards of medical practice; and must be reasonable in terms of duration

4  and quantity. 42 C.F.R. § 409.44(b)(3). To be considered "skilled," a service must

5  be "so inherently complex that it can be safely and effectively performed only by, or

6  under the supervision of, professional or technical personnel," 42 C.F.R.

7  § 409.32(a), such as physical therapists, occupational therapists, or speech

8  pathologists. 42 C.F.R. § 409.31(a).

9      50.    To make it possible for a reviewer to determine whether services were

10  reasonable and necessary, claims for skilled care coverage must include "sufficient

11  documentation." *See* CMS, *Medicare Benefit Policy Manual*, Ch. 8, § 30.2.2.1 (Aug.

12  6, 2021).

13      51.    Medicare rules require that each SNF complete a series of assessments

14  on each resident. SNFs must document these assessments on a form called the

15  Minimum Data Set ("MDS"). *See* 42 U.S.C. § 1395yy(e)(6)(B); 42 C.F.R. § 483.20.

16      52.    Completion of the MDS assessment requires the SNF to certify as

17  follows:

18      I certify that the accompanying information accurately reflects resident
        assessment information for this resident and that I collected or
19      coordinated collection of this information on the dates specified. . . . I
        understand that this information is used as a basis for . . . payment from
20      federal funds. I further understand that payment of such federal funds
        and continued participation in the government-funded health care
21      programs is conditioned on the accuracy and truthfulness of this
        information, and that I may be personally subject to or may subject my
22      organization to substantial criminal, civil, and/or administrative
        penalties for submitting false information.
23

24  CMS, *Long-Term Care Facility Resident Assessment Instrument 3.0 User's Manual*,

25  Version 1.17.1 (Oct. 2019), *available at* https://downloads.cms.gov/files/mds-3.0-

26  rai-manual-v1.17.1_october_2019.pdf.

27      53.    CMS conditions payments from Medicare to institutional providers,

28  such as SNFs, on their enrollment in the Medicare program. Institutional providers

1  apply for enrollment by completing a Medicare enrollment application, known as a

2  Form CMS-855A. *See* CMS, *Medicare Enrollment Application (Institutional*

3  *Providers), Form CMS-855A*, *available at* https://www.cms.gov/medicare/cms-

4  forms/cms-forms/downloads/cms855a.pdf. To complete such an enrollment, an

5  institutional provider must: (1) certify that it will abide by applicable "Medicare

6  laws, regulations and program instructions"; and (2) attest that it understands that

7  "payment of a claim by Medicare is conditioned upon the claim and the underlying

8  transaction complying with such laws, regulations, and program instructions." *Id.*

9       54.    When a SNF submits a claim to Medicare on CMS Form-1450 UB-04,

10  the form requires the provider who signs the form to represent, among other things,

11  that "the submitter did not knowingly or recklessly disregard or misrepresent or

12  conceal material facts."

13       55.    Under its prospective payment system ("PPS"), Medicare pays a SNF a

14  daily rate for each day of skilled nursing and rehabilitation services provided to a

15  patient. *See* CMS, *Medicare Program; Prospective Payment System and*

16  *Consolidated Billing for Skilled Nursing Facilities*, 63 Fed. Reg. 26,252, 26,259-60

17  (May 12, 1998). The rate is based, in part, on the patient's anticipated "need for

18  skilled nursing care and therapy." CMS, *Final Rule for Medicare Program's*

19  *Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities*,

20  64 Fed. Reg. 41,644 (July 30, 1999). From October 2010 through September 2019,

21  CMS used the RUG-IV case-mix classification methodology to determine the daily

22  rate. *See* CMS, *Medicare Program; Prospective Payment System and Consolidated*

23  *Billing for Skilled Nursing Facilities for FY 2013*, 77 Fed. Reg. 46214, 46217 (Aug.

24  2, 2012). Beginning October 1, 2019, CMS switched to the PDPM case-mix

25  reimbursement methodology. *See* CMS, *Medicare Program; Prospective Payment*

26  *System and Consolidated Billing for Skilled Nursing Facilities (SNF) Final Rule for*

27  *FY 2019, SNF Value-Based Purchasing Program, and SNF Quality Reporting*

28  *Program*, 83 Fed. Reg. 39162 (Aug. 8, 2018).

**B.    RUG-IV**

56.    Under RUG-IV, the daily PPS reimbursement rate depended on the RUG to which a patient was assigned. CMS intended each RUG to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs. There were five general rehabilitation RUG levels for those beneficiaries that required rehabilitation therapy: Rehab Ultra High (known as "RU"), Rehab Very High ("RV"), Rehab High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL"). *See* 83 Fed. Reg. at 39169-71. Table 1 shows the therapy intensity for each RUG category and the corresponding range of Medicare reimbursement.

**Table 1. Per-diem Reimbursement by Rehab Category.**
The following table shows the case-mix adjusted per-diem payment ranges for each category of rehabilitation therapy, based on the FY 2019 SNF reimbursement schedule for residents in urban facilities. Extensive service case-mix groups (E1-E3) per-diem rates are omitted.

| Category | Therapy Amount | Per Diem Rate |
|---|---|---|
| Ultra High Rehab | 720+ minutes per week | $527.97-$832.89 |
| Very High Rehab | 500 – 720 minutes per week | $467.27-$741.34 |
| High Rehab | 325 – 499 minutes per week | $374.00-$671.66 |
| Medium Rehab | 150 – 324 minutes per week | $320.28-$616.13 |
| Low Rehab | 45 – 150 minutes per week | $259.78-$541.10 |
| No Rehab | Less than 45 minutes per week | $208.65-$513.57 |

57.    RUG-IV rules required a SNF to determine each patient's RUG as of specific "assessment reference dates" ("ARDs"). *See* 83 Fed. Reg. at 39229. Table 2 shows the Medicare assessment schedule for FY 2019.

**Table 2. Medicare Assessment Schedule (RUG-IV)**
The following table shows the Medicare assessment schedule for FY 2019 and associated Medicare payment days. For instance, the 14-day MDS assessment determined the per-diem rate for days 15-30 of a SNF patient's stay.

| Medicare MDS Assessment Schedule Type | Assessment Reference Date Timeframe | Assessment Reference Date Grace Days | Applicable Standard Medicare Payment Days |
|---|---|---|---|
| 5-day | Days 1-5 | 6-8 | 1-14 |
| 14-day | Days 13-14 | 15-18 | 15-30 |
| 30-day | Days 27-29 | 30-33 | 31-60 |
| 60-day | Days 57-59 | 60-63 | 61-90 |
| 90-day | Days 87-89 | 90-93 | 91-100 |

58.    By increasing the quantity of rehabilitation therapy provided, or claimed to have been provided, without otherwise changing any other care to a

-16-

1  patient, a SNF could move the patient to a higher RUG category and thereby
2  increase the per-diem Medicare reimbursement amount. For example, reclassifying
3  a patient from RM to RU could yield more than $200 extra per day. Keeping a
4  patient in the SNF at RU when the patient no longer required any skilled nursing
5  services at all would yield an additional $527.97 to $832.89 per day.

6  **C.     PDPM**

7      59.     CMS intended PDPM to be a "payment model which derives payment
8  classifications almost exclusively from verifiable resident characteristics." 83 Fed.
9  Reg. at 39194. In introducing PDPM, CMS expressed concern that the RUG-IV
10  model's use of service-based metrics (such as therapy minutes) in determining
11  reimbursement incentivized the provision of care based on SNFs' financial
12  considerations rather than patient needs. *See id.* CMS posited that the PDPM
13  classification system would "improve the SNF PPS by basing payments
14  predominantly on clinical characteristics rather than service provision, thereby
15  enhancing payment accuracy and strengthening incentives for appropriate care." *Id.*
16  at 39195.

17      60.     The PDPM system bases reimbursement on five components: Nursing,
18  Physical Therapy ("PT"), Occupational Therapy ("OT"), Speech-Language
19  Pathology ("SLP"), and Non-Therapy Ancillary Services ("NTA"). *See* 83 Fed. Reg.
20  at 39189. Each of these components is further divided into case-mix groups. Each
21  case-mix group corresponds to a case-mix index, which is a number that is
22  multiplied by the federal base per diem rate to determine the patient's daily
23  reimbursement amount for that component. *See id.* at 39209, 39212, 39216, 39223.

24      61.     SNFs use the MDS to classify patients into case-mix groups for PDPM.
25  The PDPM assessment schedule requires only two scheduled assessments for each
26  SNF stay: the 5-day assessment and a discharge assessment. (Other interim
27  assessments can be performed but are not required.) *See* 83 Fed. Reg. at 39231.
28  Consequently, the 5-day assessment becomes central to SNF Medicare

reimbursement under PDPM, as that can determine the case-mix group and therefore the daily reimbursement amount for the duration of the patient's stay.

### 1.    PDPM Nursing Component

62.    The PDPM Nursing component has 25 case-mix groups spread across five major categories: Special Care High, Special Care Low, Clinically Complex, Behavioral Symptoms and Cognitive Performance, and Reduced Physical Function. Assignment to a particular Nursing case-mix group depends on whether the patient has depression, the patient's "Function Score," and the intensity of restorative nursing services the patient requires. If the patient has a total Function Score of 14 or less and suffers from a specified serious medical condition (such as septicemia, respiratory therapy, and comatose), as documented on the MDS, the patient qualifies for one of the Special Care High case-mix groups (HDE1, HDE2, HBC1, and HBC2), which have the highest daily reimbursement amounts. *See* 83 Fed. Reg. at 39215; CMS, *PDPM Calculation Worksheet for SNFs* at 25, *available at* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/SNFPPS/Downloads/SNF_PDPM_Classification_Walkthrough_v2.pdf. Table 3 illustrates how these different criteria determine a patient's Nursing component case-mix group and the associated daily reimbursement amount for the SNF for the Nursing component.

**Table 3. PDPM Nursing Component Case-Mix Groups**
This table illustrates how patient characteristics reported on the MDS (clinical conditions, depression, function scores, and restorative nursing services) are used to classify patients into PDPM Nursing component case-mix groups, which are intended to reflect the intensity of the resources the patient requires. 22 of the 25 Nursing component case-mix groups are listed in this table; the table does not show the three extensive services case-mix groups because they account for only 0.8% of claims and are not a focus of this analysis. The Nursing component reimbursement rates in the rightmost column are a product of multiplying the applicable case-mix index by the Nursing component base rate, which was $105.92 for SNFs in urban areas in fiscal year 2020.

| Clinical conditions | Depression | Function Score | Restorative Nursing Services | Case-Mix Group | Case-Mix Index | Per Diem Reimbursement |
|---|---|---|---|---|---|---|
| Serious medical conditions, e.g., comatose, septicemia, respiratory therapy (Special Care High) | Yes | 0-5 | …. | HDE2 | 2.40 | $254.21 |
| | No | 0-5 | …. | HDE1 | 1.99 | $210.78 |
| | Yes | 6-14 | …. | HBC2 | 2.24 | $237.26 |
| | No | 6-14 | …. | HBC1 | 1.86 | $197.01 |

| Serious medical conditions, e.g., radiation therapy or dialysis (Special Care Low) | Yes | 0-5 | .... | LDE2 | 2.08 | $220.31 |
|---|---|---|---|---|---|---|
| | No | 0-5 | .... | LDE1 | 1.73 | $183.24 |
| | Yes | 6-14 | .... | LBC2 | 1.72 | $182.18 |
| | No | 6-14 | .... | LBC1 | 1.43 | $151.47 |
| Conditions requiring complex medical care | Yes | 0-5 | .... | CDE2 | 1.87 | $198.07 |
| | No | 0-5 | .... | CDE1 | 1.62 | $171.59 |
| | Yes | 6-14 | .... | CBC2 | 1.55 | $164.18 |
| | Yes | 15-16 | .... | CA2 | 1.09 | $115.45 |
| | No | 6-14 | .... | CBC1 | 1.34 | $141.93 |
| | No | 15-16 | .... | CA1 | 0.94 | $99.56 |
| Behavioral or cognitive symptoms | .... | 11-16 | 2 or more | BAB2 | 1.04 | $110.16 |
| | .... | 11-16 | 0-1 | BAB1 | 0.99 | $104.86 |
| Assistance with daily living and general supervision | .... | 0-5 | 2 or more | PDE2 | 1.57 | $166.29 |
| | .... | 0-5 | 0-1 | PDE1 | 1.47 | $155.70 |
| | .... | 6-14 | 2 or more | PBC2 | 1.22 | $129.22 |
| | .... | 15-16 | 2 or more | PA2 | 0.71 | $75.20 |
| | .... | 6-14 | 0-1 | PBC1 | 1.13 | $119.69 |
| | .... | 15-16 | 0-1 | PA1 | 0.66 | $69.91 |

*See* 83 Fed. Reg. at 39217-18; *see also* CMS, *Medicare Program; Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities; Updates to the Quality Reporting Program and Value-Based Purchasing Program for Federal Fiscal Year 2020*, 84 Fed. Reg. 38728, 38733-36 (Aug. 7, 2019).

63.     The Patient Mood Interview (PHQ-9) and the Staff Assessment of Patient Mood (PHQ-9-OV), coded in Section D of the MDS Assessment, determine whether a patient is depressed for purposes of the PDPM Nursing component. Patients with total severity scores greater than 10 on the PHQ-9 or PHQ-9-OV qualify as depressed for PDPM classification. *See* CMS, *Long-Term Care Facility Resident Assessment Instrument 3.0 User's Manual*, Version 1.17.1 (Oct. 2019), *available at* https://downloads.cms.gov/files/mds-3.0-rai-manual-v1.17.1_october_2019.pdf.

64.     As Table 3 shows, patients with serious medical conditions, depression, and lower function scores are assigned to case-mix groups that correlate to higher case-mix indexes, which in turn yield higher daily reimbursement amounts. For example, a SNF can receive approximately $28 to $55 more per day for the Nursing

-19-

1  component by classifying a patient as Special Care High rather than Special Care

2  Low. Likewise, a SNF can receive approximately $16 to $43 more per day for the

3  Nursing component by coding a patient for depression.

4      65.    A low function score is indicative of the patient needing greater

5  assistance. Accordingly, Medicare reimburses more for care of patients with lower

6  function scores than for care of patients with higher function scores. *See* 83 Fed.

7  Reg. at 39216. As shown in Table 3, a SNF can receive approximately $14 to $38

8  more per day for the Nursing component by assigning a low function score to a

9  patient.

10     **2.    PDPM SLP Component**

11     66.    The SLP component of the PDPM has 12 case-mix groups that derive

12 from combinations of five different clinical factors: (i) mechanically altered diet; (ii)

13 swallowing disorder; (iii) acute neurologic condition; (iv) SLP-related comorbidity;

14 and (v) cognitive impairment. *See* 83 Fed. Reg. at 39212-13; *see also* 84 Fed. Reg.

15 at 38735-36. Table 4 illustrates how combinations of these factors determine SLP

16 case-mix groups and reimbursement.

17 **Table 4. PDPM SLP Component Case-Mix Groups**
18 This table illustrates how patient characteristics reported on the MDS are used to classify patients into SLP component case-mix groups. The associated case-mix indexes are used to adjust Medicare reimbursement to account for patient resource intensity. The SLP component reimbursement rates reported in this table are for urban facilities using the
19 fiscal year 2020 base rate of $22.68.

| Presence of Acute Neurologic Condition, SLP Related Comorbidity, or Cognitive Impairment | Mechanically Altered Diet or Swallowing Disorder | Case-Mix Group | Case-Mix Index | Per Diem Payment |
|---|---|---|---|---|
| None | Neither | SA | 0.68 | $15.42 |
| None | Either | SB | 1.82 | $41.28 |
| None | Both | SC | 2.67 | $60.56 |
| Any one | Neither | SD | 1.46 | $33.11 |
| Any one | Either | SE | 2.34 | $53.07 |
| Any one | Both | SF | 2.98 | $67.59 |
| Any two | Neither | SG | 2.04 | $46.27 |
| Any two | Either | SH | 2.86 | $64.86 |
| Any two | Both | SI | 3.53 | $80.06 |
| All three | Neither | SJ | 2.99 | $67.81 |
| All three | Either | SK | 3.70 | $83.92 |
| All three | Both | SL | 4.21 | $95.84 |

67. Section C of the MDS Assessment includes patients' Brief Interview for Mental Status ("BIMS") Summary Scores. BIMS Summary Scores range from 0 to 15 and indicate patients' cognitive levels, which affect case-mix classification for the PDPM SLP component. *See* 83 Fed. Reg. at 39207. Patients with BIMS scores from 13-15 are cognitively intact, while patients with BIMS scores of 12 or below are cognitively impaired. *See* 83 Fed. Reg. at 39207.

68. Patients with greater numbers of SLP-related conditions are assigned to case-mix groups with higher case-mix indexes and higher daily reimbursement amounts. Table 4 shows, for example, that having both a mechanically altered diet and a swallowing disorder, as opposed to having neither, increases the reimbursement for the SLP component by approximately $28 to $45 per day per patient. Likewise, Table 4 shows that the presence of either an Acute Neurologic Condition, an SLP-Related Comorbidity, or Cognitive Impairment, as opposed to having none of those, increases the reimbursement for the SLP component by approximately $7 to $22 per day per patient.

69. As shown in Table 4 above, the assigned SLP component case-mix group indicates whether a patient has an Acute Neurologic Condition, an SLP-Related Comorbidity, or Cognitive Impairment, or whether a patient has two or three of those conditions. At the same time, unless the SLP case-mix group is SJ, SK, or SL (or SA, SB, SC) – each of which indicates that the patient has all three of those conditions (or none) – the SLP case-mix group otherwise does not indicate which specific conditions the patient has. For example, case-mix group SD indicates that a patient has one of those three conditions, without specifying which the patient has. Case-mix group assignments under the PDPM appear on the CMS-1450 Medicare claim form as part of a five-digit HIPPS code. *See* CMS, *Long-Term Care Facility Resident Assessment Instrument 3.0 User's Manual*, Version 1.17.1 at Z-1 (Oct. 2019), *available at* https://downloads.cms.gov/files/mds-3.0-rai-manual-v1.17.1_october_2019.pdf; CMS, *Definition and Uses of Health Insurance*

-21-

*Prospective Payment System Codes (HIPPS Codes)* (Apr. 2022), available at
https://www.cms.gov/Medicare/Medicare-Fee-for-Service-
Payment/ProspMedicareFeeSvcPmtGen/Downloads/hippsuses.pdf. As discussed
below, Relator's analysis examines HIPPS codes on Medicare claims to determine
PDPM case-mix assignment.

<u>**Overview of Relator's Data Source and Statistical Analysis**</u>

70.    Pursuant to a Limited Data Set Data Use Agreement ("DUA") with
CMS, Relator obtained and utilized non-public data on claims for SNF stays,
preceding hospital stays, and beneficiary Medicare enrollment status for the period
from January 1, 2016, through December 31, 2021. The data does not include
patient identifying information, but it includes diagnosis codes, certain procedure
codes, payment amounts, case-mix groups, the provider (facility), attending
physician identifiers, type of Medicare enrollment, and some patient-level
characteristics such as gender, race, and age (in 5-year intervals).

71.    Relator also obtained and utilized other public data sets from CMS,
such as nursing home ownership data.

72.    Relator has analyzed the data obtained under the DUA, along with
other data, to identify and expose fraud, waste, and abuse in healthcare. As part of
its mission, Relator has discovered and exposed misreporting in key nursing home
quality measures, such as underreporting of pressure ulcers and falls. Relator also
has analyzed COVID misreporting in nursing homes and has used the non-public
data obtained from CMS to develop a SNF ranking system. Relator has published
some results from its analysis of the CMS data on the website
https://www.nursinghomereporting.com.

73.    As further described below, Relator conducted a variety of statistical
analyses to determine whether the ReNew Health SNFs, in particular, were
systematically inflating Medicare claims under both RUG-IV and PDPM. Relator
compared individual ReNew Health SNFs to all other SNFs with at least 100 patient

admissions during PDPM, totaling 11,950 SNFs ("Non-ReNew Health SNFs").

Additionally, Relator compared the ReNew Health SNFs collectively to other SNF systems with at least 1,000 patient admissions during PDPM, totaling 528 systems.

## Factual Allegations

**A.      The ReNew Health SNFs Owned By Solorzano Billed Excessively Under RUG-IV.**

74.      During the period from January 1, 2016, through September 30, 2019, the 11 ReNew Health SNFs directly owned by Solorzano (*see* ¶¶ 20-30, *supra*) provided an average of 25.1 days of Ultra High Rehab per stay, substantially more than the national average of 15.6 days of Ultra High Rehab per stay during the same period. The average days of Ultra High Rehab at the 11 ReNew Health SNFs directly owned by Solorzano ranked 39th highest nationally as a system. Moreover, these SNFs significantly increased their billed days of Ultra High Rehab over time. During the last nine months of RUG-IV, in 2019, the 11 ReNew Health SNFs directly owned by Solorzano ranked as the 24th highest system by days of RU, with an average of 26.3 days of Ultra High Rehab per stay, nearly 80% higher than the national rate of 14.7 RU days per stay in 2019.

75.      Relator's analysis, as depicted in Figure 1 below, further shows that at least seven of these ReNew Health SNFs – Griffith Park, Hyde Park, Orange County, Orinda Care Center, Parkwest, Santa Fe Heights, Valley Vista – drastically increased their billing at the RU level after Solorzano acquired them in 2015 and 2016. For example, at Griffith Park, average days of RU increased from 10.0 before the Solorzano acquisition to 26.6 afterward; at Valley Vista, average days of RU increased from 1.8 before the Solorzano acquisition to 29.8 afterward; and at Hyde Park, average days of RU increased from 0 before the Solorzano acquisition to 26.2 afterward.

1  **Figure 1. Rate of Ultra High Rehab (RU) at Seven Solarzano-Owned ReNew Health SNFs During RUG-IV**
   Figure 1 shows the 3-month rolling average rate of RU during RUG-IV. In each graph, the black vertical dashed line
2  represents the date of Solorzano's acquisition of the SNFs according to CMS data. The grey line is the rate prior to the
   acquisition, and the red line is the rate after acquisition. The dotted blue line represents the national average RU days
3  billed from January 1, 2016, through September 30, 2019.



20      76.    Relator ran a t-test for the difference in average Ultra High Rehab days
21  to test the effect of Solorzano's acquisitions of these seven facilities. At each
22  facility, the p-value calculated from the test was nearly 0, meaning that the change
23  in average Ultra High Rehab days has a less than 1 in 100 million chance of
24  occurring randomly. This result indicates that the increase in Ultra High Rehab
25  billed for patients upon Solorzano's acquisitions was statistically significant and not
26  due to random variation or chance.

27

28

**B.    The ReNew Health SNFs Billed Excessively Under The PDPM Nursing Component.**

77.    When PDPM came into effect, the ReNew Health SNFs systematically changed the way they filled out patient MDS forms so that, among other things, they began coding patients excessively and unnecessarily for depression and Special Care High to maximize reimbursement under the PDPM Nursing component.

**1.    Relator's Analysis Demonstrates That The ReNew Health SNFs Coded Patients Excessively For Depression.**

78.    Relator's statistical analysis found that, after the implementation of PDPM, the ReNew Health SNFs inflated reimbursement by adding unfounded diagnoses of depression. Across all of their claims from October 1, 2019, through December 31, 2021, the ReNew Health SNFs coded 40.2 percent of patients for depression, compared to 9.8 percent of patients at Non-ReNew Health SNFs during the same period. In other words, the coding of patients for depression at ReNew Health SNFs was *more than four times the national average*.

79.    Furthermore, Figure 2 shows that the purported rate of depression at ReNew Health SNFs has increased significantly over time since the implementation of PDPM in October 2019, while a similar increase has not taken place nationwide.

**Figure 2. Rate of Depression at ReNew Health SNFs During PDPM**
Figure 2 shows the rate of Nursing component case-mix groups that require a depression diagnosis, by month with a 3-month rolling average. ReNew Health SNFs are in red and Non-ReNew Health SNFs are in grey.



Non-ReNew Health SNFs ——— ReNew Health SNFs

80.    As Figure 2 shows, the ReNew Health SNFs dramatically increased their rate of coding for depression in the first year and a half after the implementation of PDPM. During the first six months after the implementation of PDPM, the ReNew Health SNFs coded an average of 20.7 percent of their patients for depression. By the time of the six-month period from July 2021 through December 2021, that rate had more than tripled, to 69.6 percent. Given that the rate of coding for depression in other SNFs was largely unchanged over the same time period, this increase can only have been a product of management directives to code for depression without legitimate basis.

81.    To test whether patient-specific factors somehow might justify the ReNew Health SNFs' coding of depression, Relator created a bin-based approach to analyze patients by the principal diagnosis codes from their prior inpatient admissions. Within the 93 principal diagnosis bins, Relator compared the rate of coding for depression at ReNew Health SNFs to the rate of coding for depression at Non-ReNew Health SNFs. For example, at the ReNew Health SNFs, patients with the principal diagnosis code of schizophrenia spectrum and other psychotic

1  disorders were coded for depression 42.5 percent of the time, while at Non-ReNew

2  Health SNFs patients with the same principal diagnosis code were coded for

3  depression just 10.0 percent of the time. Similarly, patients with a principal

4  diagnosis code of septicemia were coded for depression 41.9 percent of the time at

5  ReNew Health SNFs, but only 11.7 percent of the time at Non-ReNew Health SNFs.

6  In fact, the ReNew Health SNFs coded patients for depression at a rate higher than

7  the nationwide average across 92 of the 93 principal diagnosis groups. As an

8  example, Figure 3 shows the ReNew Health SNFs coded for depression at rates

9  much higher than the national average across each of the ten most common principal

10  diagnoses.

11  **Figure 3. Rate of Depression by Previous Inpatient Principal Diagnosis at ReNew Health SNFs and Non-ReNew
Health SNFs**

12  Figure 3 shows, for the top ten most common inpatient principal diagnosis groups, the rate of coding for depression on
the Nursing component of the MDS at ReNew Health SNFs (red) and Non-ReNew Health SNFs (grey).



21  % of Admissions Billed with Depression

22  Non-ReNew Health SNFs    ReNew Health SNFs

24  76.  Relator further developed a unique regression analysis to isolate the

25  Defendants' impact on the coding of depression at the ReNew Health SNFs. Relator

26  controlled for a variety of factors contributing to the probability that a patient should

27  be billed for depression, including patient characteristics such as the principal

28  diagnoses from the prior inpatient hospital visit that necessitated the SNF admission,

the principal and secondary diagnoses on the patient's first Medicare A claim at the SNF, demographic information such as age and gender, and whether the patient had a recent diagnosis of depression. Relator also controlled for patient county demographic characteristics (such as income and unemployment). The regression for depression analyzed the likelihood a particular patient would be coded for depression based on these characteristics. Relator calculated a "residual" reflecting the percentage of patients coded for depression in the aggregate beyond what could be explained by the patients' characteristics.

82.    The ReNew Health SNFs had an unexplained rate of depression (or residual) of 22.5 percent, ranking them near the 95th percentile of prevalence of unexplained depression coding among all SNF systems in the country. Additionally, the ReNew Health SNFs have the highest rate of unexplained depression coding among all SNF systems in California. Given that the ReNew Health SNFs coded 41.9 percent of their patients for depression, 22.5 percent of all patient admissions that were unexplained represents about 53.6 percent (22.5 percent / 41.9 percent) of all ReNew SNF stays with coding for depression. In other words, over half of the instances of coding for depression at the ReNew Health SNFs cannot be explained by patient characteristics.

83.    CMS creates, tracks, and reports quality measures based on SNF-reported MDS data. For quality measure reporting, CMS separates patients into one of two mutually exclusive categories: short-stay patients who stayed in a SNF less than or equal to 100 days, and long-stay patients who stayed in a SNF for at least 101 days. As under PDPM, the quality measure for depression requires a depression score of 10 or higher, with the addition of also requiring the SNF to report the patient as having little interest or pleasure in doing things or feeling down, depressed, or hopeless half or more of the days over the last two weeks (MDS sections D0200A2/B2 or D0500A2/B2 equal 2 or 3).

84.     Relator compared each SNF system's reported rate of depression for long-stay patients from its quality measures, where SNFs have an incentive to report lower rates of depression, to the rate at which each SNF system coded patients for depression on Medicare Part A claims under PDPM, where SNFs have a financial incentive to report higher rates of depression. Figure 4 shows both the long-stay and PDPM depression rates over time at ReNew Health SNFs and Non-ReNew Health SNFs. From 2016 through September 2019, before PDPM took effect, the ReNew Health SNFs classified almost no long-stay patients (nearly 0 percent) as depressed on the MDS. Nationally, approximately 5 percent of long-stay patients were classified as depressed during that same time period. After PDPM was implemented, the long-stay quality measure depression rate at ReNew Health SNFs began to increase, and by 2021 was nearly 20 percent, or 47 times higher than it had been in 2018. During the same period nationally, by contrast, the average long-stay quality measure depression rate increased by a much smaller amount, from 4.6 percent in 2018 to 7.4 percent in 2021. Meanwhile, as noted above, the PDPM depression rate at ReNew Health SNFs skyrocketed to over 60 percent in 2021.

**Figure 4. System-Wide Comparison of Long-Stay Depression Rate and PDPM Depression Coding Rate**
In Figure 4, the red dot-dashed line shows the long-stay depression rate at ReNew Health SNFs, and the solid red line shows the rate of coding for depression under PDPM at ReNew Health SNFs. The grey lines show the same rates for Non-ReNew Health SNFs.



85.    Notably, as Figure 4 shows, during the period from October 1, 2019, through December 31, 2021, the rates of depression at Non-Renew Health SNFs under long-stay quality measures and under PDPM stayed relatively close – 7.1 percent vs. 9.8 percent. During the same period, the ReNew Health SNFs coded 41.9 percent of Medicare Part A patients for depression, but only coded 12.4 percent of long-stay patients for depression on quality measures. In 2021, ReNew Health SNFs billed 63.5 percent of Part A patients for depression, yet coded just 17.5 percent of long-stay patients for depression on quality measures. The significant disparity between the long-stay depression rate and PDPM depression rate is a clear indicator that the ReNew Health SNFs have coded patients as depressed for increased Medicare Part A reimbursement, rather than in an attempt to code patient diagnoses accurately. Since Medicare Part A covers only 100 days in a skilled nursing facility, while long-stay patients are any patients (under any insurance) that stay at a facility for more than 100 days, it is possible to receive a higher reimbursement for a patient

by coding for depression under PDPM but discharging the patient before they can affect the facility's long-stay depression quality measure.

### 2. Relator's Analysis Demonstrates That The ReNew Health SNFs Billed Excessively For Special Care High.

86.    On average, during the period from October 2019 through December 2021, the ReNew Health SNFs coded 48.2 percent of patients for Special Care High, while the national average rate was 31.0 percent. By October 2021, the three-month rolling average rate of coding for Special Care High at the ReNew Health SNFs had reached 67.3 percent, while the national rate had had increased only to 34.8 percent.

**Figure 5. Rate of Coding for Special Care High at ReNew Health SNFs**
Figure 5 shows the rate of PDPM Nursing component case-mix groups that require a Special Care High condition, by month with a 3-month rolling average. ReNew Health SNFs are in red and Non-ReNew Health SNFs are in grey.



87.    A SNF could artificially inflate the number of Special Care High patients by marking additional conditions on the MDS that the patient was not actually experiencing. For example, if a patient were using a feeding tube (MDS section K0510B1 or K0510B2), the SNF could mark the patient as having a fever (MDS section J1550A) to change their clinical condition from Special Care Low to Special Care High.

88.     The ReNew Health SNFs coded a high proportion of patients for
Special Care High regardless of their underlying medical condition and diagnoses.
As seen in Figure 6, across all ten of the most common previous inpatient principal
diagnosis groups for patients at ReNew Health SNFs, there was a significantly
higher rate of Special Care High than at Non-ReNew Health SNFs. For example, the
ReNew Health SNFs used Special Care High to code 46 percent of the 263 patient
stays where the patients previously were diagnosed with urinary tract infections,
while Non-Renew Health SNFs used Special Care High to code only 30.4 percent of
patients who had the same preceding diagnoses. This pattern holds true for 84 of the
93 principal diagnosis categories with at least ten patient stays at ReNew Health
SNFs.

**Figure 6. Rate of Special Care High by Previous Inpatient Principal Diagnosis at the ReNew Health SNFs and Non-ReNew Health SNFs**
Figure 6 shows, for the ten most common previous inpatient principal diagnosis groups at the ReNew Health SNFs, the rate of Special Care High coded on the Nursing component at the ReNew Health SNFs (red) and at Non-ReNew Health SNFs (grey).



84.     The ReNew Health SNFs' high rate of coding for Special Care High
cannot be explained by other patient and demographic characteristics. Relator again
ran a regression analysis which controlled for diagnoses, procedures, and
demographic characteristics. Relator found that 11.9 percent of the ReNew Health

SNFs' patient stays had Special Care High which could not be attributed to patient characteristics. In other words, while the ReNew Health SNFs coded 48.2 percent of their patients for Special Care High, only 36.3 percent (48.2 percent minus 11.9 percent) of those patients should have been billed as such according to the regression analysis. This would have been much closer to the national rate of 31.0% coded for Special Care High.

### 3. Relator's Interviews With Former Employees Confirm That The ReNew Health SNFs Engaged In Clinically Unjustified Coding Practices Under The PDPM Nursing Component To Increase Reimbursement.

89.    To obtain higher reimbursement under the PDPM Nursing Component, the ReNew Health SNF MDS coordinators, as opposed to the SNFs' treating clinical personnel, dictated the coding of patient conditions on MDS forms, even when those conditions were inconsistent with the treating clinicians' own observations.

90.    A former Social Services Director at Olympia recalled consultants coming in from headquarters to train the SNF's staff on how to fill out the MDS "for more pay." They specified that the Social Service Director was responsible for filling out sections D (covers depression), E (covers behavior status), and Q (covers resident participation). In this meeting, the consultants explained how to raise the scores for these sections for the purpose of increasing Medicare reimbursements independent of the patient's condition.

91.    A former Social Services Director at Santa Anita experienced the same training, in addition to receiving guidance on completing section C (the BIMS Summary Score, which covers cognitive impairment billing). For the depression section, the consultants instructed the Social Services Director that the sections D0300 or D0600 score "had to be at least 10," which is the minimum cutoff for a patient to qualify as depressed for reimbursement purposes. She also found that, after closing MDS assessments, the SNF's Director of MDS was reopening and changing the assessments so that the SNF would receive more Medicare revenue.

92.     A former Registered Nurse Supervisor at Rancho Mesa shared a similar experience. The administrator of Rancho Mesa asked the Registered Nurse Supervisor to sign off on forms that qualified a patient as depressed based on a calculation rather than a "physical diagnosis," even when the Registered Nurse Supervisor had no knowledge of the patient's condition.

**C.    The ReNew Health SNFs Coded Excessively For Certain Clinical Factors Under The PDPM Speech-Language Pathology Component.**

93.     To obtain higher reimbursement under the PDPM SLP component, management at the ReNew Health SNFs pressured staff to change patient health assessments in ways that directly affected key payment thresholds. The former Registered Nurse Supervisor at Rancho Mesa recalls receiving questions about patients from the administrator like "didn't you think this person's memory was getting worse?" The Registered Nurse Supervisor would respond that she spoke directly to the patients every day and did not observe impairment. Nonetheless, she recalls the administrator suggesting that she assess the patients as cognitively impaired. This pressure was indicative of the extreme SLP component coding practices at the ReNew Health SNFs.

**1.    The ReNew Health SNFs Coded Patients For Swallowing Disorders And Mechanically Altered Diets With Improbable Frequency.**

94.     CMS and the American Speech-Language-Hearing Association have flagged the potential for PDPM billing abuse by putting patients on mechanically altered diets or keeping them on such diets longer than necessary. *See* S. Warren, ASHA WIRE, *Mechanically Altered Diets Are a Factor in New SNF Payment System*, *available at* https://leader.pubs.asha.org/doi/10.1044/leader.BML.24112019.34. Relator's statistical analysis indicates that the ReNew Health SNFs engaged in exactly these practices; the ReNew Health SNFs' coding of patients with both swallowing disorders and mechanically altered diets was a significant outlier and indicative of a

1  systematic attempt to inflate reimbursement by adding unfounded clinical

2  conditions.

3    95.    Relator determined whether a patient was coded for a mechanically

4  altered diet, a swallowing disorder, both conditions, or neither condition based on

5  the patient's SLP component case-mix group (shown in Table 4 above). Across all

6  claims from October 1, 2019, through December 31, 2021, the ReNew Health SNFs

7  billed 35.9 percent of their patients as having both swallowing disorders and

8  mechanically altered diets, compared to 13.0 percent of patients with both

9  conditions at Non-ReNew Health SNFs, *i.e.*, almost triple the national average. The

10 ReNew Health SNFs collectively ranked sixth highest among all SNF systems

11 nationwide by proportion of patients coded for having both swallowing disorders

12 and mechanically altered diets.

13    96.    Relator again used a regression analysis to examine whether the

14 extremely high rate of both swallowing disorders and mechanically altered diets at

15 the ReNew Health SNFs could be explained by patient and demographic

16 characteristics, rather than by practices in place at the ReNew Health SNFs to inflate

17 revenue. The regression analyzes the likelihood a particular patient would be billed

18 as having both a swallowing disorder and mechanically altered diet based on their

19 characteristics, such as diagnoses and demographic information. Relator calculated

20 residuals; across all claims for each system, the average residual refers to the

21 percentage of patients having both swallowing disorders and mechanically altered

22 diets in the aggregate beyond what is explained by the patients' characteristics.

23    97.    Figure 7 below shows that the ReNew Health SNFs collectively have

24 an unexplained rate of patients with both mechanically altered diet and swallowing

25 disorder of 17.5 percent, which ranks them as the sixth highest system in the country

26 in that metric. In other words, 48.7 percent (17.5 percent of the total of 35.9 percent)

27 of the ReNew Health SNFs' claims for patients coded with both conditions cannot

28

1  by explained by patient characteristics, thus indicating that coding practices in place

2  at the ReNew Health SNFs caused inflated billing.

3  **Figure 7. Regression of Swallowing Disorder and Mechanically Altered Diet by System**
This figure plots the residuals from a regression of swallowing disorders and mechanically altered diets based on
patient and claim characteristics for SNF systems with at least 1,000 patient stays. Small vertical bars represent the
95% confidence interval for the residual. A negative value for average unexplained percentage of patients with both
diet restrictions indicates that a system coded fewer patients for both diet restrictions than would be predicted based
on patient characteristics.



## 2. Relator's Analysis Demonstrates That The ReNew Health SNFs Coded Patients For Acute Neurologic Conditions, SLP Comorbidities, And Cognitive Impairment At Improbable Rates.

98.    A patient is considered to have an Acute Neurologic Condition based

on the primary diagnosis on the MDS, which, as CMS has noted, should match the

principal diagnosis on the Medicare Part A claim. Using Medicare Part A claims

data from January 1, 2016, through December 31, 2021, Relator analyzed if the

announcement and implementation of PDPM billing rules resulted in a change in

Acute Neurologic principal diagnoses. Figure 8 shows that, before August 2018,

when CMS published an outline of the structure of PDPM, Acute Neurologic

principal diagnosis rates at ReNew Health SNFs (9.0 percent of patients) were very

close to those at Non-ReNew Health SNFs (7.7 percent of patients). As the formal

implementation date of PDPM neared, the rate of Acute Neurologic principal

diagnoses increased nationally, but increased much more sharply at ReNew Health

SNFs. From the implementation of PDPM in October 2019 through the end of 2021,

ReNew Health SNFs coded 33.9 percent of patients with an Acute Neurologic

principal diagnosis, while Non-ReNew Health SNFs coded only 15.7 percent of

their patients with that diagnosis during the same time period. Indeed, the gap

continued to widen as time progressed.

**Figure 8. Rate of Acute Neurologic Conditions Over Time**
Figure 8 shows the rate of Acute Neurologic principal diagnoses by month with a three-month rolling average
between ReNew Health SNFs (red) and Non-ReNew Health SNFs (grey).



Non-ReNew Health SNFs — ReNew Health SNFs

99.    Another component of SLP billing is SLP-related comorbidities, where

a patient qualifies if they have conditions such as Aphasia, Dysphagia, or ALS.

During the period from October 1, 2019, through December 31, 2021, the ReNew

Health SNFs coded 22.7 percent of their patients as having an SLP-related

comorbidity, substantially higher than the rate of 15.3 percent at Non-ReNew Health

SNFs.

100.    The final SLP component is cognitive impairment. Using the patient's

SLP HIPPS code and related diagnoses from the SNF claim, Relator can determine

the existence of cognitive impairment on the SNF claim. For example, if the claim

shows that a patient had two SLP conditions, but they did not have an acute

neurologic principal diagnosis, then the patient must have been coded as cognitively impaired. During the period from October 2019 through December 2021, the ReNew Health SNFs collectively billed 81.6 percent of their patients as having cognitive impairment, well above the national average rate of 55.3 percent. The ReNew Health SNFs have the eighth highest rate of patients billed for cognitive impairment among all SNF systems nationwide, as shown in Figure 9.

**Figure 9. Rate of Cognitive Impairment by System**
This figure shows the rate of stays for patients coded as having Cognitive Impairment for systems with at least 1,000 patient admissions.



101.    As seen above, the ReNew Health SNFs coded for acute neurologic conditions, SLP comorbidities, and cognitive impairment at high rates. Since these conditions are not mutually exclusive, Relator analyzed the average number of SLP conditions for a patient. At ReNew Health SNFs, the average patient had 1.39 of these conditions, while the average patient at Non-ReNew Health SNFs had 0.87 of the same conditions. As a system, the ReNew Health SNFs rank twelfth in the nation for the average number of SLP conditions coded per patient, as shown in Figure 10.

**Figure 10. Average Number of SLP Conditions Coded Per Patient by System**
This figure shows the average number of SLP conditions (acute neurologic conditions, SLP comorbidities, and cognitive impairment) per admission for systems with at least 1,000 admissions.



| Non-ReNew Health SNFs | ReNew Health SNFs |

102.  Relator again used a regression analysis to examine whether the high number of SLP conditions at the ReNew Health SNFs could be explained by patient and demographic characteristics, rather than by practices in place at the ReNew Health SNFs to inflate revenue. The regression analyzes the expected number of SLP conditions based on the patient characteristics, such as diagnoses and demographic information. Relator calculated residuals; across all claims for each system, the average residual refers to the average number of SLP Conditions per patient beyond what is explained by the patients' characteristics.

103.  Figure 11 below shows that the ReNew Health SNFs collectively have an average of 0.28 unexplained SLP Conditions per patient, which ranks the ReNew Health SNFs 18th highest in the country in terms of this metric. The ReNew Health SNFs' average number of SLP conditions per patient is 1.6 times higher than the national average (1.39 versus 0.87) and the regression analysis indicates that only 0.24 of the difference can be explained by patient characteristics, which leaves unexplained 0.28 of the ReNew Health SNFs' SLP conditions per patient.

**Figure 11. Regression of SLP Conditions by System**
This figure plots the residuals from a regression of SLP conditions based on patient and claim characteristics for SNF systems with at least 1,000 patient stays. Small vertical bars represent the 95% confidence interval for the residual. A negative value for average unexplained SLP conditions per patient indicates that a system coded fewer patients for SLP conditions than would be predicted based on patient characteristics.



### D.    Relator's Statistical Analysis Confirms that the ReNew Health SNFs Kept Patients For Excessively Long Stays.

104.    Relator's statistical analysis confirms that the ReNew Health SNFs kept Medicare Part A patients for excessively long stays. Using SNF claims data under PDPM, Relator analyzed the average length of stay at ReNew Health SNFs and Non-ReNew Health SNFs as measured by the number of days covered by Medicare Part A. During the period from October 2019 through December 2021, the average length of a patient stay at the ReNew Health SNFs was 42.1 days, 14.5 days longer than the national average length of stay of 27.6 days, *i.e.*, 52.5 percent longer than the national average. Further, the ReNew Health SNFs frequently kept patients the full 100 days allowable by Medicare. Figure 12 below shows that 14.0 percent of ReNew Health SNF patients stayed the full 100 days covered by Medicare, more than six times the national average of 2.3 percent.

**Figure 12. Distribution of Total Days Billed**
This figure shows the percentage of patient stays at each number of days billed to Medicare Part A by ReNew Health SNFs (red) and Non-ReNew Health SNFs (grey) for patients admitted from October 1, 2019, through December 31, 2021.



105.    Similar to previous analyses, Relator ran a regression using patient characteristics to calculate the unexplained length of stay for patients, meaning the extra days patients stayed at ReNew Health SNFs beyond what can be explained by patient characteristics. Figure 13 shows that, as a group, the ReNew Health SNFs rank in the top five percent among all systems nationwide with an average unexplained length of stay of 9.1 days. In other words, of the 42.1-day average length of stay at ReNew Health SNFs, 21.6 percent (9.1/42.1) is unexplained by underlying patient characteristics.

**Figure 13. Regression on Length of Stay.**
Figure 13 plots the residuals from a regression of length of stay based on patient and claim characteristics, for patients admitted from October 1, 2019, through December 31, 2021. Small vertical bars represent the 95% confidence interval for the residual. A negative value for average unexplained length of stay indicates that a system may have kept patients a shorter time than would be predicted based on patient characteristics.



106.    The former Director of Rehabilitation at Orange County remembers feeling exploited by management for telling her to keep patients for the full 100 days under Part A. She recalled a patient who was able to run after 20 days in their stay, and so she told management that the patient should be discharged. Management responded by not approving the discharge and instead keeping the patient for the full 100 days of Part A and then using Part B afterwards. A former Licensed Vocational Nurse at Villa Mesa recalls asking the MDS coordinator the expected stay length for certain patients. The MDS coordinator responded that the expected length of stay was 100 days because of the available insurance coverage. The former Licensed Vocational Nurse recalls the Director of Nursing and Administrators acting as the shot callers, telling the MDS coordinator specifically that they were "at risk of losing their job if they don't bring in the dollars."

## Count I:  False or Fraudulent Claims
### (31 U.S.C. § 3729(a)(1)(A))

107.    Relator repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

108. During the period from January 1, 2016, through at least December 31, 2021, Defendants knowingly presented, or caused the presentation of, false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), specifically, claims for payment to Medicare Part A for unreasonable, unnecessary, or unskilled therapy, for therapy that was not provided, or for SNF care that was reimbursed based on unjustified patient diagnoses and characterizations.

109. By virtue of the false or fraudulent claims Defendants knowingly presented, or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### Count II:  False Records and Statements
(31 U.S.C. § 3729(a)(1)(B))

110. Relator repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

111. During the period from January 1, 2016, through at least December 31, 2016, Defendants knowingly made, used, or caused to be made or used false records or statements, including false MDS forms, material to false or fraudulent claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

112. By virtue of the false records or statements Defendants made, used, or caused to be made or used, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### Count III:  False or Fraudulent Claims
(Cal. Gov. Code § 12651(a)(1))

113. Relator repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

114. During the period from January 1, 2016, through at least December 31, 2021, Defendants knowingly presented, or caused the presentation of, false or fraudulent claims for payment or approval, in violation of the California False

-43-

Claims Act, Cal. Gov. Code § 12651(a)(1), specifically, claims for payment to Medi-Cal for Medicare Part A coinsurance amounts for unreasonable, unnecessary, or unskilled SNF care, or for SNF care that was not provided.

115.    By virtue of the false or fraudulent claims Defendants knowingly presented or caused to be presented, the State of California has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## **Prayer for Relief**

WHEREFORE, Relator demands and prays for the following relief:

1.    That judgment be entered in favor of the United States for the amount of its damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper;

2.    That judgment be entered in favor of the State of California for the amount of its damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper;

3.    An award to Relator of a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730(d) and Cal. Gov. Code § 12652(g)(2);

4.    An award to Relator of its costs and reasonable attorney fees for prosecuting this action; and

5.    All other relief as may be required or authorized by law and in the interests of justice.

## **Demand for Jury Trial**

Relator hereby demands a trial by jury.

1  Dated: August 17, 2023      Respectfully submitted,

2                 Relator Integra Med Analytics LLC

3

4           By:

5                Gregg Shapiro
                 Gregg Shapiro Law, LLC

6                Attorney for Relator

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**PRIORITY® MAIL**

PRIORITY MAIL
POSTAGE REQUIRED

**FROM:**
Gregg Shapiro
30 Francis St
Brookline, MA 02446

**TO:**
Office of the Clerk
U.S. District Court
Central District of California
350 W. 1st Street
Suite 4311
Los Angeles, CA 90012-4565

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE